**IN THE UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| **RONALD REID,** | ) | |
| | ) | |
| *Plaintiff,* | ) | **Civil Action No: 3:20-CV-00050** |
| | ) | |
| **v.** | ) | |
| | ) | **Judge Trauger** |
| **William Lee, Governor of the State** | ) | |
| **of Tennessee, in his official capacity;** | ) | |
| | ) | |
| **Et al.** | ) | |
| | ) | **JURY DEMAND** |
| *Defendants.* | ) | |

---

### PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS

---

Comes now Plaintiff, by and through counsel, and submits this **Statement of Undisputed Material Facts** pursuant to L.R. 56.01(b) in connection with Plaintiff's motion and memorandum for summary judgment.

1) In 1991, at the age of 16, Mr. Reid raped an adult woman in Shelby County, Tennessee. (Ex. A, <u>Reid Depo</u>, 9:01 – 9:17).

**RESPONSE:**


2) Mr. Reid's case was prosecuted in adult criminal court, and Mr. Reid was convicted of Aggravated Rape and sentenced to ten years in prison. *Id.*

**RESPONSE:**

3) At the time, Tennessee had no sex offender registration or restriction laws whatsoever. *See Doe v. Haslam*, 2017 U.S. Dist. LEXIS 186130, at *1 – 12 (M.D. Tenn. 2017) (recounting the history of Tennessee's SORA regime).

**RESPONSE:**


4) In 1994, while Mr. Reid was serving his sentence, Tennessee enacted its first, very limited SORA regime, requiring that offenders be entered into a private law enforcement database. *Id*.

**RESPONSE:**


5) Mr. Reid served his time, got married while he was incarcerated, and was released in 1998 without any parole or other supervision. (Ex. A, <u>Reid Depo</u>, 9:01 – 9:17, 10:21 – 13:16, 15:15 – 16:10, 17:12 – 19:07).

**RESPONSE:**


6) Mr. Reid moved in with his wife and her son, helped raise his stepson, and a few years later had a son of his own with his wife. *Id*.

**RESPONSE:**


7) After his release, Mr. Reid submitted his sex offender registry paperwork directly to the TBI, as required by then-existing law. (Ex. B, <u>Reid TBI Registration</u>).

**RESPONSE:**

2

8) However, the very limited sex offender registry in effect in from 1998 – 2003 interfered only minimally with Mr. Reid's life, and he was able to live a relatively normal life. (Ex. A, Reid Depo, 9:01 – 9:17, 10:21 – 13:16, 15:15 – 16:10, 17:12 – 19:07).

**RESPONSE:**

9) Mr. Reid was very involved with his stepson, regularly taking him to the park to play basketball and taking him on trips to California to see Mr. Reid's extended family. *Id.*

**RESPONSE:**

10) After his 1998 release, Mr. Reid got a part-time job at Auto Express selling cars, as well as a job at a grill factory. *Id.* at 26:14 – 32:14.

**RESPONSE:**

11) Mr. Reid later left the grill factory to work at a packaging company, and then in 2001 left the packaging company to work at the Matthew Walker clinic, as a Health Educator giving presentations on heart health and diabetes to disadvantaged communities. *Id.*

**RESPONSE:**

12) Mr. Reid held the Matthew Walker job from 2001 – 2009, still working part-time at Auto Express, until the grant that had funded the Matthew Walker job ran out. *Id.*

**RESPONSE:**

3

13) After the Matthew Walker job ended Mr. Reid went full time at Auto Express, eventually becoming the general manager. *Id.*

**RESPONSE:**

14) In 1998, after his release, Mr. Reid joined Mt. Zion Baptist Church. *Id.* at 32:24 – 34:24.

**RESPONSE:**

15) Mr. Reid told the church leadership that he had just gotten out of prison, explained what he had been incarcerated for, and asked them to pray for him. *Id.* at 41:04 – 41:22.

**RESPONSE:**

16) For over twenty years, Mr. Reid would attend Sunday services as well as weekly Wednesday Bible study sessions. *Id.* at 82, 175 – 176.

**RESPONSE:**

17) Mr. Reid worked for Mt. Zion for several years as an usher, and then starting in 2005 as a member of the video production team. *Id.* at 32:24 – 34:24.

**RESPONSE:**

18) Over the years, Mr. Reid developed a true passion for video production, ultimately becoming Mt. Zion's video productions director. *Id.*

**RESPONSE:**

19) Mr. Reid became close with many of the church leaders and parishioners over the years, earning their trust and respect. *Id.* at 160 – 176.

**RESPONSE:**


20) In 2003 and 2004, Tennessee passed draconian new sex offender laws – hereafter referred to as "SORA" – that severely restricted the lives of convicted sex offenders, including past offenders like Mr. Reid. *See Doe v. Haslam*, 2017 U.S. Dist. LEXIS 186130, at *1 – 12 (M.D. Tenn. 2017).

**RESPONSE:**


21) The new laws impacted Mr. Reid's life severely, especially in the realm of parenting. Mr. Reid had to report to the Metro Nashville Police Department's ("MNPD") SORA office quarterly to register and pay a $150 fee every year, on pain of arrest and prosecution. (ECF 6-3, <u>Reid Decl</u>, ¶¶ 2 – 4).

**RESPONSE:**


22) Mr. Reid was required to notify MNPD within ten days if he moved, update MNPD with any job changes, and update MNPD with the identifying information for any vehicle that he possessed. (Ex. A, <u>Reid Depo</u>, 52 – 53, 91 – 97).

**RESPONSE:**


23) Whereas Mr. Reid had been able to take his stepson to the park to play basketball and do other things with him before the 2003 – 2004 SORA enactments, SORA prohibited Mr.

Reid from giving the same level of parenting to his own son. *Id*. at 9, 17 – 18; T.C.A. § 40-39-211.

**RESPONSE:**


24) Indeed, SORA prohibited Mr. Reid from taking his children anywhere where other children were likely to be found. *Id.*; (Ex. A, <u>Reid Depo</u>, 21 – 26, 57:08 – 57:11, 136 – 146, 154 – 156, 160, 204 – 209).

**RESPONSE:**


25) Thus, Mr. Reid could not take his children to the park, to a playground, to a public sports event, to the beach, to the pool, to the toy store, or to anywhere else where children go. *Id.*

**RESPONSE:**


26) In 2010, Mr. Reid divorced his first wife. *Id.* at 15:20 – 17:08.

**RESPONSE:**


27) In 2012, Mr. Reid married his second wife. *Id.* at 16:25 – 20:22.

**RESPONSE:**


28) Mr. Reid had a daughter with his second wife in 2013, and a son with her in 2019. *Id*

**RESPONSE:**

29) Mr. Reid and his daughter are very close, and he has consistently spent as much time with her as he could. *Id.* at 21:06 – 23:04.

**RESPONSE:**

30) However, the SORA restrictions severely impacted the ways in which they could spend time together. *Id.*

**RESPONSE:**

31) Because Mr. Reid could not take his daughter anywhere designed for children, he came up with alternatives at home – the built a movie studio for them to watch movies in, he got her a trampoline for the backyard, and he got her three dogs. *Id.* at 22.

**RESPONSE:**

32) But, the restrictions still bit hard. *Id.* at 21:22 – 21:25.

**RESPONSE:**

33) When Mr. Reid's daughter enrolled in gymnastics class, SORA prohibited Mr. Reid from taking her there. *Id.* at 154 – 156.

**RESPONSE:**

34) While SORA did not explicitly prohibit Mr. Reid from dropping off and picking up his daughter from school, it did prohibit him from attending school events without the principal's explicit permission. *Id.* at 23 – 25.

**RESPONSE:**


35) Mr. Reid tried dropping his daughter off at school a couple times, but stopped after the principal made a harsh statement toward him about being a sex offender. *Id.* at 23 – 24.

**RESPONSE:**


36) In "the hardest moment of [Mr. Reid's] whole entire life," Reid asked for permission to attend his daughter's kindergarten graduation – and was denied. *Id.* at 24 – 26.

**RESPONSE:**


37) After he missed the graduation, his daughter told him she felt like she did not have a daddy that day. *Id.* at 209.

**RESPONSE:**


38) Because of SORA, Mr. Reid could not help pass out candy at Halloween, one of his daughter's favorite holidays. *Id.* at 76 – 78.

**RESPONSE:**


39) Instead, Mr. Reid had to hide inside the house watching TV while his daughter decorated and passed out candy on her own. *Id.*

**RESPONSE:**


8

40) One year, MNPD informed Mr. Reid that he could not have Halloween decorations at his house at all. *Id.*

**RESPONSE:**


41) Naturally, the one who was hurt the most by this was Mr. Reid's daughter. *Id.*

**RESPONSE:**


42) In 2010, MNPD arrested Mr. Reid and charged him with a felony SORA violation because he spent a short time staying with a friend while he and his first wife were having marital problems. (Ex. A, <u>Reid Depo</u>, 91 – 97; Ex. C, <u>Crim Case Docs</u>, at 4).

**RESPONSE:**


43) In the wake of this arrest, Mr. Reid's name and picture were published in the sex offender section of "Just Busted" magazine, which was seen by numerous people in his community. (Ex. A, <u>Reid Depo</u>, at 120 – 121).

**RESPONSE:**


44) Over the years, Mr. Reid has repeatedly been copied on "sex offender alert" emails addressed to families living in his neighborhood, labeling Mr. Reid as a "violent sex offender." (ECF 6-3, <u>Reid Decl</u>., ¶ 7; Ex. A, <u>Reid Depo</u>, at 147 – 149).

**RESPONSE:**

9

45) For years, Mr. Reid had worked toward the dream of owning his own video production

company.  (Ex. A, <u>Reid Depo</u>, at 210 – 213).

**RESPONSE:**


46) This dream began in the year 2005, when Mr. Reid took a video production class at Mt.

Zion.  *Id.* at 15.

**RESPONSE:**


47) Mr. Reid started working with Mt. Zion's video production team, initially running a

camera and then, after several years of developing his skills and earning credibility, as the

production team's director.  *Id.* at 32 – 34.

**RESPONSE:**


48) Mt. Zion paid Mr. Reid as a contract worker for his video production work, typically

about $8,000 per year.  (*Id.* at 32 – 34; Ex. D, <u>1099 Samples</u>).

**RESPONSE:**


49) From around 2014 or so onward, Mr. Reid also did contract work for a company called

"White House Productions," running the camera and directing for them.  (Ex. A, <u>Reid</u>

<u>Depo</u>, at 34 – 36).

**RESPONSE:**

50) By April 2019, Mr. Reid had accumulated about $10,000 worth of video production equipment. *Id.* at 40. He was ready to make the leap, and opened his own shop – "High Def Productions." (Ex. A, <u>Reid Depo</u>, 210:01 – 210:22).

**RESPONSE:**

51) Mr. Reid's first video contract job for High Def was a White House Productions gig to shoot a school play at Harding Academy, a private school. *Id.* at 102 – 104.

**RESPONSE:**

52) On April 10, 2019, Mr. Reid showed up Harding Academy for the job. *Id*; (Ex. C, <u>Criminal Case Docs</u>, at 1).

**RESPONSE:**

53) The school's security staff took him to a back room, and told him that he was on the sex offender registry and had violated his restrictions. *Id.*

**RESPONSE:**

54) Mr. Reid left, realized that High Def would never work, and went the next day to get a business license for Reid's Towing – a towing and repossession company. (Ex. A, <u>Reid Depo</u>, at 74, 102, 210; Ex. E, <u>Business License</u>).

**RESPONSE:**

55) Giving up on High Def was very painful for Mr. Reid. *Id.* at 210 – 211.

**RESPONSE:**


56) Unfortunately for Mr. Reid, that same day Harding Academy reported what had

happened to MNPD.  (Ex. C, <u>Criminal Case Docs</u>, at 2).

**RESPONSE:**


57) Under Metro policy, MNPD enforced SORA on *ex post facto* offenders like Mr. Reid the

same as offenders who committed their offenses after SORA was enacted.  (Ex. F, <u>Metro</u>

<u>30(b)(6) Depo</u>, 52:20 – 53:22; Ex. G, <u>Metro Interrogatory Responses</u>, ¶¶ 12, 18).

**RESPONSE:**


58) Indeed, Metro policy was for its sex offender detectives to file a warrant for violations by

any sex offender – including *ex post facto* offenders – whenever the detectives had

"investigated and confirmed" a registry violation.  (Ex. F, <u>Metro 30(b)(6) Depo</u>, 52:20 –

53:22, 82 – 83).

**RESPONSE:**


59) Consequently, MNPD's SORA detectives worked up the case, drafted a warrant affidavit,

and filed a Class E felony charge against Reid for violating SORA.  (Ex. C, <u>Criminal</u>

<u>Case Docs</u>, at 1; Ex. H, <u>Elliot Depo</u>, 98, 104 – 107).

**RESPONSE:**

60) The only violation alleged was Mr. Reid's visit to Harding Academy, for a video production job on behalf of White House Productions. *Id.*

**RESPONSE:**


61) The fact that Mr. Reid's original offense had been against an adult, not a child, was not a factor in the decision to file the charge. (Ex. H, <u>Elliot Depo</u>, 98, 104 – 107).

**RESPONSE:**


62) About a week later, Mr. Reid went to MNPD to report his new towing and repossession company. (Ex. A, <u>Reid Depo</u>, 102 – 104).

**RESPONSE:**


63) When he got to MNPD, MNPD arrested him on the outstanding warrant. *Id.* Mr. Reid posted bond to get out of jail. *Id.*

**RESPONSE:**


64) The arrest quickly hit the news, in which Mr. Reid was described as a "Violent Sex Offender" who should never be permitted around children.[1]

**RESPONSE:**


65) The owner of White House Productions, a close friend of Reid's named Jim Hunter who had considered Mr. Reid his "go to" up until this point, suffered a serious business

---

[1] https://www.wkrn.com/news/crime-tracker/police-violent-sex-offender-attempts-to-enter-nashville-private-school/.

setback and public humiliation as he struggled to contain the damage from the scandal. *Id.* at 35 – 36, 158 – 160, 211.

**RESPONSE:**

66) Mr. Reid's relationship with Mr. Hunter was forever changed by the arrest and negative publicity. *Id.* at 35, 211.

**RESPONSE:**

67) Mr. Reid hired a lawyer, fought the criminal charge, and ultimately got the State to drop the prosecution. *Id.*; (Ex. C, <u>Criminal Case Docs</u>, at 3).

**RESPONSE:**

68) However, the arrest and media coverage had already branded Mr. Reid for life.[2]

**RESPONSE:**

69) Mr. Reid threw himself into Reid's Towing. (Ex. A, <u>Reid Depo</u>, at 54 – 68).

**RESPONSE:**

70) While he has been able to make a reasonable living with the business, repossessing cars because the owners cannot pay their debts is stressful, joyless, and dangerous work. *Id.*

**RESPONSE:**

---

[2] https://www.wkrn.com/news/crime-tracker/police-violent-sex-offender-attempts-to-enter-nashville-private-school/.

71) Mr. Reid has been shot at "many times" by people whose vehicles he repossessed, and has two bullet holes in his newest truck. *Id.* at 62 – 64.

**RESPONSE:**


72) Mr. Reid has experienced many other risks and conflicts doing repo work. (*E.g.* Ex. I, <u>MNPD Reports</u>).

**RESPONSE:**


73) Mr. Reid's daughter always wants to be with him, and wants to go to work with him. (Ex. A, <u>Reid Depo</u>, at 21).

**RESPONSE:**


74) But with one out of ten repossession subjects threatening Mr. Reid with violence, it is too dangerous to bring her. *Id.* at 212 – 213.

**RESPONSE:**


75) For over twenty years, Mr. Reid had attended Sunday services at Mt. Zion as well as weekly Wednesday Bible study sessions. *Id.* at 40:14 – 40:18, 175:25 – 176:03.

**RESPONSE:**


76) Mr. Reid's family, especially his daughter, were very involved with the church. *Id.* at 40 – 45, 160.

**RESPONSE:**

77) As video productions director, Mr. Reid had the trust of his camera operator staff as well as much of the congregation.  *Id.* at 160 – 176.

**RESPONSE:**


78) Regardless, once the news of the 2019 arrest hit Mt. Zion expelled Mr. Reid.  *Id.* at 40 – 45, 171 – 174.

**RESPONSE:**


79) When he came back once after the expulsion to see his daughter serve as a flag girl, he was ordered to leave.  *Id.* at 42 – 45.

**RESPONSE:**


80) After that, Mr. Reid found a new church and never returned.  *Id*.

**RESPONSE:**


81) There is no evidence tending to show that Tennessee's Sex Offender Registration and Monitoring Act ("SORA") generally reduces the incidence of criminal offenses.  (Ex. J, Lee Interrogatory Responses, ¶ 1; Ex. K, Rausch Interrogatory Responses, ¶ 1; Ex. G, Metro Interrogatory Responses, ¶ 1).

**RESPONSE:**

82) There is no evidence to show any other societal benefits of SORA.  (Ex. J, <u>Lee Interrogatory Responses</u>, ¶ 2; Ex. K, <u>Rausch Interrogatory Responses</u>, ¶ 2; Ex. G, <u>Metro Interrogatory Responses</u>, ¶ 2).

**RESPONSE:**

83) There is no evidence indicating that the legislature considered any evidence in enacting any aspect of SORA. (Ex. J, <u>Lee Interrogatory Responses</u>, ¶ 5; Ex. K, <u>Rausch Interrogatory Responses</u>, ¶ 5; Ex. G, <u>Metro Interrogatory Responses</u>, ¶ 5).

**RESPONSE:**

84) There is no evidence tending to show that failure to enforce SORA on Plaintiff will increase the likelihood of Plaintiff committing future offenses. (Ex. J, <u>Lee Interrogatory Responses</u>, ¶ 6; Ex. K, <u>Rausch Interrogatory Responses</u>, ¶ 6; Ex. G, <u>Metro Interrogatory Responses</u>, ¶ 6).

**RESPONSE:**

85) There are no ways in which Tennessee has narrowed SORA in order to avoid infringing the Constitutional right against *ex post facto* punishment. (Ex. J, <u>Lee Interrogatory Responses</u>, ¶ 8; Ex. K, <u>Rausch Interrogatory Responses</u>, ¶ 8; Ex. G, <u>Metro Interrogatory Responses</u>, ¶ 8).

**RESPONSE:**

86) Defendants have no justifications other than the text of the SORA statute for enforcing SORA on Plaintiff notwithstanding his Constitutional right against *ex post facto* punishment. (Ex. J, Lee Interrogatory Responses, ¶ 9; Ex. K, Rausch Interrogatory Responses, ¶ 9; Ex. G, Metro Interrogatory Responses, ¶ 9).

**RESPONSE:**

87) Metro has maintained and funded a dedicated SORA-enforcement unit for over a decade, staffed by two full-time SORA detectives who are supported by an administrative assistant. (Ex. F, Metro 30(b)(6) Depo, 40 – 42; Ex. H, Elliot Depo, 7 – 11).

**RESPONSE:**

88) Since at least 2018, the SORA detectives have been organized into a formal "Sex Offender Registry Unit." (Ex. M, 2018 MNPD Manual Excerpt).

**RESPONSE:**

89) Prior to that, the SORA detectives were part of MNPD's Sex Crimes unit. (Ex. N, 2014 MNPD Manual Excerpt).

**RESPONSE:**

90) Regardless, functionally speaking the SORA detectives have been doing the same dedicated SORA enforcement duty for years. (Ex. F, Metro 30(b)(6) Depo, 40 – 42; Ex. H, Elliot Depo, 7 – 11).

**RESPONSE:**

91) Under Metro policy, the job of these detectives is to register sex offenders, ensure offender compliance with SORA, and arrest and prosecute SORA violators. (Ex. F, Metro 30(b)(6) Depo, 24).

**RESPONSE:**

92) Under Metro policy, the SORA detectives must enforce SORA on all sex offenders defined as such under Tennessee law, including *ex post facto* offenders like Mr. Reid. (Ex. G, Metro Interrogatory Responses, ¶¶ 12, 18; Ex F, Metro 30(b)(6) Depo, 52 – 53; Ex. O, Sexton Depo, 60:21 – 63:04).[3]

**RESPONSE:**

93) Metro policy requires its SORA detectives to proactively conduct "compliance checks," investigate possible violations, and arrest and prosecute SORA violators – regardless of the offender's *ex post facto* status. (Ex. F, Metro 30(b)(6) Depo, 24, 52 – 53; Ex. G, Metro Responses, ¶¶ 12, 18; Ex. H, Elliot Depo, 61:09 – 61:16 (Metro required its SORA

---

[3] Metro's designated 30(b)(6) representative was MNPD Inspector Harmon Hunsicker, who leads the bureau to which MNPD's Sex Offender Unit is assigned. (Ex. E, Metro 30(b)(6) Depo, 7 – 11). Surprisingly, Inspector Hunsicker was completely unaware until his August 12, 2021 deposition that on August 5, 2020 this Court had enjoined SORA enforcement against Mr. Reid on *ex post facto* grounds. *Id*. at 18 – 21.

detectives to do home verifications/compliance checks); Ex. O, <u>Sexton Depo</u>, 44:15 – 45:03).

**RESPONSE:**


94) Metro also requires the SORA detectives to log their daily activities, tracking the following categories:

- Offenders Registered;

- Juvenile Offenders Registered;

- SOR Investigations (Tips, Complaints, Etc.);

- Patrol Requests/ Phone Calls;

- Warrants Obtained;

- Warrants Served;

- Warrants Attempted;

- Persons Arrested;

- Home Verification;

- Case Prep Notices Prepared;

- Hours in Court;

- Days Worked

(Ex. N, <u>SOR Data Sheets</u>).[4]

**RESPONSE:**

---

[4] Exhibit K is an excerpt of the SORA data sheets provided by Metro in discovery. The exhibit reflects the annual data totals for each of the years 2019 – 2011, beginning with 2019 and ending with 2011. Metro also provided the weekly data sheets for each week during each of the years in question, but those are not filed here.

95) In 2019, the year MNPD arrested and charged Mr. Reid for going to the school on a

video production job, MNPD's SORA detectives conducted 2,540 SORA investigations,

669 Home Verifications, and fielded 1,510 Patrol Requests. *Id.* They obtained 333

warrants, attempted service of 535 warrants, served 147 warrants, and arrested 94 people.

*Id.* They prepared 21 Case Prep notices, and spent 331 hours in court prosecuting alleged

SORA violations. *Id.*

**RESPONSE:**


96) MNPD's practice on home verifications, also referred to as "compliance checks," is to

attempt to verify every registered offender's address at least once per year. (Ex. H, Elliot

Depo, 55:11 – 56:14).

**RESPONSE:**


97) To conduct a compliance check, the SORA detectives make a surprise visit to the

offender's home, sometimes accompanied by patrol officers. (Ex. H, Elliot Depo, 48:20

– 49:15, 108:21 – 110:03; Ex. O, Sexton Depo, 34:02 – 34:22, 79:15 – 79:21).

**RESPONSE:**


98) After showing up unannounced, the detectives investigate for possible SORA violations –

questioning the offender, talking to family members, and sometimes seeking consent to

search the home. (Ex. A, Reid Depo, 81:12 – 86:06).

**RESPONSE:**

99) If the offender is not home for the verification check, the detectives often checked records to see if they could find a witness to interview who might have information about the offender's whereabouts.  (Ex. H, <u>Elliot Depo</u>, 97:18 – 97:25).

**RESPONSE:**

100)     While these compliance checks are sometimes triggered by third-party tips, they are often just *sua sponte* fishing expeditions.  (Ex. O, <u>Sexton Depo</u>, 34:02 – 34:22).

**RESPONSE:**

101)     In the past, MNPD has had its SORA detectives organize large-scale "Compliance Operations," in which the detectives recruit help from Sex Crimes and/or Patrol, and possibly other agencies such as the U.S. Marshals service, and systematically check every offender living in a given precinct.  (Ex. O, <u>Sexton Depo</u>, 79:15 – 91:02).

**RESPONSE:**

102)     These operations commonly lasted two full days, even with the assistance of other Sex Crimes detectives, Patrol, and/or the US Marshals Service.  *Id.*

**RESPONSE:**

103)     MNPD's policy on arrest and prosecution for SORA violations is simple – SORA detectives are to arrest and prosecute sex offenders whenever the detective has "investigated and confirmed" a registry violation.  (Ex. F, <u>Metro 30(b)(6) Depo</u>, 52:20 – 53:22, 82 – 83).

**RESPONSE:**

104)    The SORA detectives' job is to ensure offender compliance and "catch violators" – moreover, failing to do so "would not be good for [the detectives'] career[s]."  *Id.* at 24:08 – 25:09.

**RESPONSE:**


105)    Metro publicly celebrates the SORA detectives' proactive enforcement activities, and has particularly highlighted the volume of arrests and home verification checks.  (Ex. Q, <u>Newsline</u>).

**RESPONSE:**


106)    Moreover, Metro requires the SORA detectives to participate in the prosecution of charged SORA violators.  (Ex. H, <u>Elliot Depo</u>, 70:02 – 70:14; Ex. O, <u>Sexton Depo</u>, 54:25 – 58:06; Ex. R, <u>Elliot Personnel File Excerpt</u>; Ex. S, <u>Sexton Personnel File Excerpt</u>).

**RESPONSE:**


107)    Thus, part of the SORA detectives' job is to consult with the prosecuting attorneys, provide background information, and give recommendations as to appropriate punishment.  *Id.*

**RESPONSE:**


108)    Metro's SORA detectives have long cooperated with the TBI to proactively enforce SORA, and at various points have cooperated with other state and federal

agencies. (Ex. O, <u>Sexton Depo</u>, 65:04 – 66:18; Ex. H, <u>Elliot Depo</u>, 18:03 – 23:06, 67:03 – 70:01; Ex. R, <u>Elliot Personnel Excerpt</u>, at 4 – 5; Ex S, <u>Sexton Personnel Excerpt</u>, at 4).

**RESPONSE:**


109)     These agencies have included the Tennessee Department of Corrections, the U.S. Marshals, and Immigration and Customs Enforcement. *Id.*

**RESPONSE:**


110)     Indeed, Metro has publicly touted its cooperation with TDOC's "Operation Blackout," a SORA operation designed to keep sex offenders from leaving their homes on Halloween. (Ex. T, <u>Press Release</u>).[5]

**RESPONSE:**




Respectfully submitted,

*s/ Kyle Mothershead*
Kyle Mothershead, BPR 22953
Relentless Advocacy, PLLC
2901 Dobbs Ave.
Nashville, TN 37211
T: (615) 212-5036 / F: (615) 229-6387
E: kyle@relentlesslaw.com

---

[5] While MNPD's sex offender detectives testified that they declined to participate in Blackout, Detective Elliot testified that other MNPD officers had participated, and that the sergeant over the sex offender detectives had asked the SORA detectives to participate as well. (Ex. G, <u>Elliot Depo</u>, 23 – 26).

24

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on **February 4, 2022**, Plaintiff's **Statement of Undisputed Material Facts in Support of Motion for Summary Judgment** was filed electronically with the Court's electronic filing system. Notice of this filing will be electronically served by operation of the Court's electronic filing system on **Robert Mitchell and Miranda Jones, Counsels for Defendants Lee and Rausch**, at robert.mitchell@ag.tn.gov and miranda.jones@ag.tn.gov and on **Brook Fox and Michael Dohn, Counsels for Defendant Metro**, at brook.fox@nashville.gov and Michael.dohn@nashville.gov.

*s/ Kyle Mothershead*
Kyle Mothershead, BPR 22953